3-0-9-0-8-6-0 R.A. Cullinan & Sons v. Ruth Lynn Keith May it please the Court Counsel The issues, the major issues in this case is that of notice, accident and causation. When this case first started and when the application was filed alleging a work accident, the individual, Ms. Keith, alleged an accident occurring in the third week of August of the year 2005. When Ms. Keith started receiving medical treatment in this case, she went and sought medical treatment in November of the year 2005 from her family physician. The evidence in this case establishes through the testimony of the lay witnesses that the first notice to my client of any alleged work accident is when she had a conversation with Laura Hammond, who was a person who testified on my client's behalf. Laura Hammond established through her testimony that she is responsible for collecting work comp claims and accidents. That conversation took place in July of the year 2006. And the unrebutted testimony of Laura Hammond in this case was that when Ms. Keith told me she was having problems with her hands and elbows related to a work activity, she told me it began in the summer of 2005. That's consistent with the application that Ms. Keith filed with the Commission. That's consistent with the testimony of Ms. Keith when she testified in this case on cross-examination. I asked her, you filed an application with the help of your attorney. Yes, I did. And you told the Commission that your accident occurred in the summer of 2005. Her response, yes. Ms. Keith calls her husband to testify in the case. And her husband testifies in the case that she started having problems in 2005, that when she was coming home from work, he noticed her having problems with her wrists at that time frame. She goes to, while the case is being developed and the employer is noticed of an alleged accident, she goes to various doctors and we had her examined by two doctors of our choice. If you look at the history given to our first independent medical examiner, that being Dr. Skank, she tells Dr. Skank in her history that her problems began in the summer of 2005. She tells our second examiner, Dr. Fletcher, he asked her when her problems began. She said in the summer of 2005. We were into this trial approximately 99%. There was over eight lay witnesses who testified. There was four medical experts who had testified at the time of trial. This case took approximately six hours to try and it was a special setting. It was at the redirect of Ms. Keith that there was an attempt to amend the application. All these people have already testified and all the work had already been done in defending this case. The arbitrator didn't allow it. In fact, if you look at the arbitrator's decision, it notes a date of August of 2005. If you believe she sustained a work-related injury in August of 2005, there's no notice within that 12 months. Is it really an absolute either or proposition? Because you've done this enough. We have cases. Somebody could become symptomatic at a certain time and sometimes it is conceivable that until they go to the doctor, they really don't tie it into work. The doctor, there's a conversation and the claimant realizes this is work-related because of the conversation with the doctor. So Connor provides, as I understand it, an opinion that says, linked her condition with her work duties, but that wasn't until July of 2006. Correct? When he was asked to link it. That's correct. That is correct. And I understand your position, Your Honor, in the sense that there are cases out there we have to examine the manifest state evidence, the Duran case. When does a reasonable person really believe that their condition is related to work activities? As opposed to some other normal cause. Yes, that's correct. If you look at the facts in this case, if you look at the application that was filed with the help of an attorney, if you look at the unrebutted testimony of Laura Haman, Ms. Keefe told her, my problems began in 2005. But problems began or that it was work-related? I mean, there's a difference. We just had the previous case. Somebody could have problems and not know the cause of the problem. This individual was a seasonal employee. The evidence shows that. This individual works 38 percent of the year because she's a seasonal employee. This is an individual who brought a witness in to corroborate that she was having problems because this, I believe it was Jack Horner testified, they saw her wearing tennis braces on her wrists because she was having problems. Her focus and the history she was giving to the doctors is different than the case of someone not knowing. She knew it began at this time frame. We're not conceding that this was caused by work, but that's the time frame it began, and that's where the overwhelming evidence points to. It points to the summer of year 2005. What does it substantively point to? That she is having problems with her wrists and arms. Is that correct? She was having problems with her wrists and arms in 2005. That's a given, yes. It does point to that. The question becomes on the face and the whole record. Do you believe that she believed it was began in the summer of year 2005? And as I've heard some back and forth with you and other attorneys regarding the notice issue, they have to give notice to the employer once they believe it's a work-related condition. And in this case, we do believe that. She went to two examinations of two of our experts. She knew it was an independent medical examination. She had an attorney, and she told them her problems began in 2005. Her problems began. That's a problem we're having. Right. And I apologize. If you look at the history she gave to Dr. Skank, she did associate those problems with the work activity she was doing on the paper. She did state that. But she stated that when? When did she see the doctor? It was after 2006. Right. Yes. It was after 2006. Is there anything in the record to say that at 2005, when I started having these problems, I was aware that it was related to my work? Her testimony. Or is it that now, in 2007, as I reflect back on it, I see there's a connection? When? It's kind of like when does the light go on in the head? I think the light goes off in the head in this case. And if you look at the testimony of Laura Hammond. The light goes off for a moment. Short and sweet. It goes on. It goes on. I'm sorry. Well, sometimes it goes off. Short and sweet testimony of Laura Hammond. She said, I'm the person responsible for taking notice of accident. Ms. Keith confirmed that. And she said Ms. Keith told her at that time, her problems began in 2005. It was Ms. Keith herself telling her that. It wasn't something she picked up. When did she tell her that? In 2006. Yeah, we're back to the same issue. What was it she told her, that her problems? Not my problems. I believe I have problems. I have problems with my hands and elbows. I believe it's work-related. But I believe it's work-related to 2005. Do you understand the important point of that is, I believe it's work-related. That's the only point. She told Ms. Hammond she felt it was work-related to the work activity she was doing back in 2005. That was the notice. So what's wrong with her? Well, I believe that if she believes an accident occurred in 2005 and her problems were related to the accident in 2005 and she filed an application alleging an accident in 2005, she should have told my client within the 45 days that she felt the 2005 activities were causing her problems or aggravating her problems. At that time, there was a work-related condition. That's not what the case has said. She has to know two things. Number one, she has to know she's injured. And number two, she has to reasonably believe that her injuries are work-related. The commission found that while she testified that she became symptomatic in 2005, it was when Dr. Conner provided her with a written opinion linking that condition to her duties that we would say in a repetitive trauma case that it's manifest in itself. So now the question is, I mean, you know, if you were correct, every time you've got somebody who doesn't discover the link between the injury and the employment until more than 45 days after manifestation of injury, they'd be out on notice. And that's simply not the case. And I understand that. And I guess our difference is I believe that the manifest evidence and she understood that her problems were developed in 2005. And if you believe the record doesn't show that, then I'm wrong. Is there anything in the record that would suggest that she knew that whatever problems became symptomatic in 2005 were work-related in 2005, that she knew this in 2005? Aside from I was informing you that she informed our representative that she felt her work problems dated back to 2005? Yeah. I ask you whether she told there's any evidence in the record that she believed that in 2005. She didn't see the doctor until November of 2005. At that time she was giving complaints to her family doctor and associated with some activities but didn't say I was on the paver having problems. Okay. If I can go then to the causation issue and also to the action issue, this is a case in which Dr. Fletcher had superior knowledge. This is a case which we generated a videotape of the petitioner herself running this paver. Now, the paver is big. If you drive down the road, you've seen it. It's a big paver. However, with today's technology and what was put in, there's manuals regarding it, this is a paver that is alleged the steering wheel, the toggle switches, and the console were causing the problems. That's what she identified to the doctors. There's no doubt the testimony in this case shows that there are other activities and other factors that make her job vary in nature. That is weather, rain, job tasks, type of tasks, type of duty she was doing. The nature of her job varied. However, her allegations are that the vibration on the steering wheel, her allegations are that her swinging this console and her working these toggle switches contributed to her condition of ill-being. Mark Maiman went on the paver. He is a therapist with Dr. Fletcher. Mark Maiman measured the vibration on the steering wheel of this paver. He also measured the vibration on the toggle switch. He took the measurements down and testified at that time at trial. Mark Maiman further did a swing force study on the console. The console panel is about this big, is this square on this podium, and it rotates on the paver back and forth depending on what side the job is on. The measured force mean force was 15 pounds. This information was given to Dr. Fletcher. Dr. Fletcher himself went on the paver. Dr. Fletcher himself did an examination and took a history. Dr. Fletcher gave the opinion at time of trial that her condition of ill-being was not related and testified that the vibratory measurements of the steering wheel did not meet the NIOSH studies of what's acceptable for work-related condition. He further testified that the force required of this console did not meet the NIOSH studies of what's a work-related condition. We also had Dr. Skank, a board-certified plastic surgeon, 40 years at Rush doing the PEMEC examination. He reviewed the videotape. He reviewed the job description. He took a history from his teeth. He also did a physical examination. He arrived at the same conclusions as Dr. Fletcher and said this was not a work-related condition. Dr. Williams' testimony is what's interesting here. Dr. Williams is a treating physician who took over the care of Ms. Keith after Dr. Conner retired. And Dr. Williams saw the petitioner in early 2007. And what's interesting is this. He was the first medical expert to call to testify on behalf of Ms. Keith in this case. And what he testified to was this. She was having continued problems. And what he felt was strange during his testimony or during the case was he couldn't quite figure out why she was still having problems with her hands and elbows even though she wasn't working. That bothered him. But also he was asked questions on direct examination and was given the opinions of Dr. Conner and was given the opinions of Dr. Fletcher and said, do you have an opinion, Dr. Williams, as to whether or not there's a relationship between this conditional well-being and the work activities. And he said, I can't tell you. He said, I cannot tell you because I can't delineate between what Dr. Conner has here and what the evidence shows as far as the job description and videotape. Dr. Conner's testimony, I think if you read cross-examination, you'll see that he avoided my questions. He answered my questions as it relates to, Doctor, have you seen a job description generated by the employer? Have you seen a videotape? Have you been on this paper? Have you seen the job logs? Answer, no, no, no, no, no. And then finally, I asked him, Doctor, then isn't it true that this condition may not be work-related? He says, I can't answer that. He says, I'm not going to answer that. He says, I've got to believe what the petitioner tells me. And then I said, as Dr. Williams conceded, I asked Dr. Williams, considering the information that Dr. Fletcher had in this case, do you defer to the opinions of Dr. Fletcher since he had more information? Dr. Williams said, yes. I absolutely defer to Dr. Fletcher because he was on the paper and he had all these studies and saw the videotape. I asked Dr. Conner the same question after Dr. Conner went through the whole litany of not having all this information, and he says, no, I'm not going to defer to Dr. Fletcher. I'm not going to do it. I asked him why, and he says, because I believe the petitioner. That was it. The lay testimony in this case establishes that the job duties vary. Even Ms. Keefe admitted there were different tasks that she had at different times. The medical expert on our behalf, Dr. Fletcher, had superior knowledge in this case over all of the doctors, and we had asked that you find that the only conclusion you can reach in this is that this is a non-work-related condition. I have one question. There were other work activities that you were alluding to, and I think some of them were using a spade or a hoe to clean off the asphalt either before or after, or maybe before and after the machine is being used, spraying the machine with diesel fuel, et cetera, et cetera. Were those activities considered by Fletcher? They were mentioned to him by Ms. Keefe, and they were also something he viewed. He went out to the job site. He did view it. Now, did he testify as relates to whether or not those had a contributing factor? I don't believe he did. Ms. Keefe herself seemed to be focused on that toggle switch, steering wheel, and console, and that's what he focused on. The activity you speak of are activities that were identified on cross-examination of Ms. Keefe that was done at the end of the day. There are certain responsibilities that each one of them do. But wasn't there also more additional mechanics of operating the paver than merely being the recipient of vibration on the wheels, such as I think someone talked about white-knuckle driving, steering, sensitivity, those types of things which could lead to a reasonable inference of tension in the arms during the operation of those hours? Well, there was conversation about white-knuckle driving by one of the lay witnesses. However, I think that's one of the reasons why we went out and did the vibratory measurement and study of the wheels. White-knuckle doesn't mean vibrational. It means the control of the... It means the degree to which one is tensed up trying to guide and keep in line a machine. And that was testimony in the case, but then I think Jack Korner got on the stand and indicated that white-knuckle, he wasn't sure what that meant, that white-knuckle was something that one of the witnesses testified to. If you look at the history given to the doctors, and you look at what Ms. Keefe had told the individuals, I don't think that the control of the paver was one that was much worried about. And I think Dr. Fletcher addressed that as relates to the study of the manuals and the hydraulics in the track system of the paver that indicated it really was not a difficult task. Through arguments leading up to here, there has been criticism of Dr. Fletcher because he akined swinging the console to that of a van, and he says it's the same as closing a van door and consoles criticized him regarding that. Interesting enough, when you talk about the steering wheel, you look at the testimony of these lay people, they compare these activities to driving a car. I believe it was Jack Korner himself that said the steering is somewhat like a Cadillac. They take and try to testifying and comparing these activities to how we would as a car, and that's what Dr. Fletcher did. I think Jack Korner identified that this paver was a paver that was one of the best. I think the evidence shows in this case that Mike Cullinan went out and tried to buy the best paver that he could, and the evidence in this case shows that if you look at the manuals, this, according to them, is a Cadillac of pavers. So they did the best they can to make it less. Your time is up, Counselor. Thank you. You'll have time on rebuttal. Thank you. May it please the Court, my name is Joe Winn, and I represent Ruth Lynn Keith in this matter. Counsel's versions of the facts are a little bit different than what I remember. Ruth Keith had been an operating engineer for 26 years for Cullinan, and she operated several paving machines. They purchased a new machine in 2003. It was called a Cedar Rapids 562 asphalt paver, and the machine came with a vibrator, and there was a control panel on it that had a seat connected to it, buttons all over it, and then the steering system with it. And depending on what direction the paver was going, you'd have to swing the control panel either to the right or to the left. And the petitioner testified that that control panel weighed about 60 pounds, and she had a difficult time doing that. Whenever they were on a straight-line paving project, for instance on the highway, they would have up to 100 dump trucks that would connect to the paver on any given day. And there was a procedure that had to be followed where you'd hit certain levers, buttons, and switches. And that was when the truck connected, it would take two to three minutes to unload the truck, the paver would push the truck along, and then it'd disconnect. And at the time of the disconnect, you'd have to go through the same procedure. At all times, she had to have one of her hands on the steering wheel because it would go off center. And counsel said that this was an excellent piece of equipment. Well, she testified that it wasn't an excellent piece of equipment. And Jack Horner testified that it was the worst paver he'd ever operated. He said there was no zero level for it, that the manufacturer had been out multiple times trying to soften the steering system. It never got accomplished. And, in fact, Cullinan's mechanics had been working on this on several occasions before she became symptomatic. You mean there's no dead center? No dead center, right. Because hydraulics are pushing both ways. Right. And in addition to the fact that if the truck pulls away and isn't going directly straight, it'll take the paver with it so that you have to have your hands on the steering wheel at all times. She worked long days. 6 a.m., she testified, Bennett testified, and Horner testified that a normal work day was nine and a half hours. The testimony shows that during the year of 2005 when she first became symptomatic, she worked more hours that year than she had any other year. She was seasonal work from March until up to about Thanksgiving weekend. She was the first one on the job. There were certain pieces of electronics that she would take from a man's truck and put on the paver so that it would work each morning. She'd fuel the truck. She'd use a straightedge hoe to chip off any asphalt that might have still been stuck on the machine, both at the beginning of the day and at the end of the day. Counsel, can you get into this notice issue? We spent a lot of time on it, but it is a significant issue. Okay. Clearly, opposing counsel is saying your client unequivocally acknowledged she was having quote-unquote problems in 2005. She was. She doesn't deny that. She testified to it. Her husband testified to it. She started having problems as early as June of 2005. So she had given notice then? Because she didn't realize that it was being caused by her work. In fact, if you look at the evidence, it establishes that all of her bills from that point forward up until Dr. Conner's examination and opinion on causation were being paid through group insurance. They weren't being submitted through workman's comp. It was only after the date that Dr. Conner put her on notice that her condition was work-related that the bills were submitted through workman's comp and never paid. There's no evidence anywhere in that record that she was ever told at any time that her condition was work-related until late July of 2006. Or she told everybody it was work-related either. Or that she told it. No, she said she was symptomatic. She told her husband that. She talked to it with her coworkers. Bennett, he talks about it. He suggested that she wear elbow braces. She wore strips around her elbows, but there was never any determination from a medical professional that her condition was work-related. First time she got medical treatment, I think it was in November of 2005 at the Tremont Clinic. Then she rested her arms over the wintertime, came back and went to work in the spring full-time, became symptomatic again. Didn't see Dr. Conner, I don't think, until June of 2006. And it wasn't until, I think it was July the 28th, that Dr. Conner said for the first time that this condition was work-related. At that point in time, the bills were no longer submitted through group insurance. They were attempted to be submitted through workman's comp but never paid. It's clear that she, the manifestation date, and I stand corrected. I filed this case with an August 1st of 2005 accident date. And the commission corrected me on that, and it was clear from the record that they were right. I tried to amend that after hearing the evidence on arbitration, but was denied the opportunity, just like counsel said. I wanted to amend it at that time, but the arbitrator said I wasn't allowed to. But it was amended on review, and the commission has the right to do so by the law that we cited in our brief. And they were correct in that, in that I believe the accident date was July the 28th, and notice was given to the company the following day. So notice is not an issue in this case. In fact, I'm looking at the issues presented for review. Notice isn't even raised as one of the issues that's before the court here today. They talk about accident, causation, temporary total disability, medical expenses, and permanent partial disability. There's no mention of notice. So I think that's a moot issue. And with regard to causation in this case, as the justice pointed out, Jack Horner testified that it was the toughest pavement he ever ran. He was constantly having to have his hand on the steering wheel. There were numerous levers that had to be operated. He described the steering mechanism as, quote, white knuckle driving. He had problems with his fingertips when steering. He started wearing fingerless jackhammer gloves with the palms padded, and he got teased for wearing those. So obviously it wasn't just her problem. He was having one heck of a problem, too, where he wouldn't have put on vibratory gloves in order to operate this machine. Added to that is the fact there was no lunch break, and counsel alluded to the fact that Dr. Fletcher described this job as no more stressful than a housewife who drives an SUV and has to open the hatchback a few times during the day. Jack Horner totally disagreed with the doctor's testimony, and he said the doctor had no idea what he was talking about. Well, let's get to Dr. Fletcher and to Mark Mammon, who's the gentleman that he had come on site. Fletcher went to the job site to observe the paver. He didn't operate the machine. He admitted that he had trouble moving the control panel himself. He had no idea how the machine would handle when in operation. He testified that his examination took 20 to 25 minutes of my client. She testified it took five. Mark Mammon, who's the director of rehab for Fletcher's office, he took a video of the operating paver. He did an on-site analysis, and on November of 2008, two years after the fact, he tested the machine in a rural area. The machine was idling at the time. None of its moving devices were in operation. It wasn't in motion, and no truck was connected to it. So obviously his measurements and calculations with regard to vibration were totally inaccurate. In fact, Mammon testified he didn't even know the machine had a vibrator on it. So I think without question, the overwhelming weight of the evidence shows that the commission was correct in its decision on all issues in this case, and that its findings certainly wasn't against the manifest weight of the evidence. Thank you. Thank you, counsel. Counsel, may we? Very brief. Very brief. You have in your possession a copy of the machine running. You can see it. You can see what it entails. Encapsulizing all the testimony, encapsulating all the opinions of the lay witnesses regarding what this job entails, I'll use the words of Ms. Keefe's witness, Bruce Bennett. Every day is a new day. He said it. When they go to work every day, every task, it varies. And that's what he said, and he was her witness, and we agree with that, in the sense that her task varied, jobs varied, rain played a part into it, heat of the asphalt played a part of it. The videotape will speak for itself. A comment was made about Jack Horner. Jack Horner told Dr. Fletcher the opposite. He said it was a great paper. He told him that. And Jack Horner contradicted Ms. Keefe on page 359, where he said, there are times you would take your hands off the wheel. So we'd ask you to reverse the decision. Thank you. Thank you, Counsel Poe, for your arguments this morning. It will be taken under advisement.